IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 124,071

STATE OF KANSAS,
*Appellee*,

v.

PATRICK ANGELO JR.
*Appellant*.

SYLLABUS BY THE COURT

1.

The summary denial of a petition for DNA testing under K.S.A. 2021 Supp. 21-2512 presents a question of law over which the appellate court has unlimited review.

2.

K.S.A. 2021 Supp. 21-2512 governs inmate requests for postconviction DNA testing. The statutory provisions governing the pretesting phase of the proceedings contemplate a three-part process leading up to the district court's decision whether testing shall be ordered. First, the petitioner must allege in the petition that biological material satisfying the threshold requirements for testing under K.S.A. 2021 Supp. 21-2512(a) exists. Second, once the State has notice of the petition, the statute requires the State to preserve any biological material it previously secured in connection with the case and identify such material in its response. Finally, once the response is filed, the parties may agree that the State has identified and preserved all known biological material and proceed to argue whether testing that identified biological material may produce noncumulative, exculpatory evidence warranting testing under K.S.A. 2021 Supp. 21-2512(c). But if the parties continue to dispute the existence of such biological material, they can present evidence to the district court for appropriate fact-finding. In that

1

circumstance, the petitioner, as the moving party, has the burden to show biological material satisfying the threshold requirements of subsection (a) exists.

3.

Under K.S.A. 2021 Supp. 21-2512(a), an inmate convicted of first-degree murder or rape may petition the district court for DNA testing of any biological material that: (1) relates to the investigation or prosecution that led to the conviction; (2) is in the actual or constructive possession of the State; and (3) was not previously subjected to DNA testing or can be tested with new DNA techniques that provide a reasonable likelihood of more accurate and probative results.

4.

In reviewing a petition made under K.S.A. 2021 Supp. 21-2512, the district court first determines whether the biological material sought to be tested meets the criteria set forth in K.S.A. 2021 Supp. 21-2512(a). If those criteria are met, the district court then considers whether testing may produce noncumulative, exculpatory evidence relevant to the claim of the petitioner that the petitioner was wrongfully convicted or sentenced. If this requirement is met, the district court must order DNA testing of the biological material specified in the petition.

5.

Evidence is exculpatory when it tends to disprove a fact in issue which is material to guilt or punishment. Determining whether evidence is exculpatory under K.S.A. 2021 Supp. 21-2512(c) is not a function of weighing the evidence. It is enough that the evidence tends to establish a criminal defendant's innocence, even if it does so by only the smallest margin.

6.

Noncumulative evidence is the converse of cumulative evidence—that is, it is evidence not of the same kind and character or not tending to prove the same thing.

Appeal from Wyandotte District Court; WESLEY K. GRIFFIN, judge. Opinion filed September 30, 2022. Affirmed in part, reversed in part, and remanded.

*Reid T. Nelson,* of Capital and Conflicts Appeals Office, argued the cause and was on the brief for appellant.

*Kayla L. Roehler*, assistant district attorney, argued the cause, and *Mark A. Dupree Sr.,* district attorney, and *Derek Schmidt*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

WALL, J.:  A jury convicted Patrick Angelo Jr. of two counts of first-degree murder for the shooting deaths of Kevin Brown and Jamie Wilson at a house in Kansas City. These convictions were mainly supported by incriminating testimony from witnesses who were at or near the house around the time of the shooting. In hopes of challenging this testimony, Angelo later petitioned for postconviction DNA testing under K.S.A. 2021 Supp. 21-2512. This statute requires a district court to order testing of biological material that is related to the case and in the State's possession when results *may* yield exculpatory, noncumulative evidence.

In support of his petition, Angelo argued DNA testing of various biological material could show the lack of his DNA and the presence of another suspect's DNA. He claimed these results would constitute exculpatory evidence probative of the identity of the shooter. Angelo also argued these results would impeach the testimony of the State's lone eyewitness to the shootings, who identified Angelo as the culprit. But the district

3

court summarily denied Angelo's petition after finding the only evidence in State custody that Angelo sought to have tested—the victims' clothing—would not produce exculpatory evidence.

Angelo now appeals the district court's denial of his petition. On appeal, the State defends the district court's conclusion that DNA testing of biological material on the victims' clothing could not produce exculpatory evidence. But the State also argues that summary denial of the petition was appropriate because Angelo failed to meet his burden to show the existence of biological material on the victims' clothing.

These issues require us to interpret K.S.A. 2021 Supp. 21-2512 to clarify the procedures and respective burdens of the parties during the pretesting phase of the proceedings. Our statutory interpretation reveals the Legislature contemplated a three-part process leading up to the district court's first decision point—whether to order DNA testing. First, the petitioner must allege in the petition that biological material satisfying the threshold requirements for testing under K.S.A. 2021 Supp. 21-2512(a) exists. Second, once the State has notice of the petition, the statute requires the State to preserve any biological material it previously secured in connection with the case and identify such material in its response. Finally, once the response is filed, the parties may agree that the State has identified and preserved all known biological material and proceed to argue whether testing that identified biological material may produce noncumulative, exculpatory evidence warranting testing under K.S.A. 2021 Supp. 21-2512(c). But if the parties continue to dispute the existence of such biological material, they can present evidence to the district court for appropriate fact-finding. In that circumstance, the petitioner, as the moving party, has the burden to show biological material satisfying the threshold requirements of subsection (a) exists.

Because the parties did not have the benefit of this statutory interpretation, their pleadings did not disclose the existence of a factual dispute concerning the presence of

4

biological material on the victims' clothing, and thus the district court did not conduct an evidentiary hearing. These circumstances warrant a remand for further proceedings consistent with our statutory interpretation.

Of course, such a remand would be futile if the district court correctly concluded that testing the biological material on the victims' clothing (material the district court presumed existed) could not yield exculpatory evidence. But under the facts of this case, we conclude such potential DNA test results may be exculpatory, and the district court erred in concluding to the contrary. We thus reverse the district court's ruling that even if biological material exists on the victim's clothing, it would not produce exculpatory evidence. However, this holding alone is not sufficient for Angelo to prevail in his quest for DNA testing. This is because the district court never made any fact finding about the actual existence of biological material on the victim's clothing. As such, we remand the matter for this factual inquiry and further proceedings consistent with this opinion.

FACTS AND PROCEDURAL BACKGROUND

In 2004, victims Brown and Wilson were staying at a house on Haskell Avenue in Kansas City with several other people, including Angelo's son, Patrick Angelo III (Little Pat). On February 18, police officers raided the house, seized drugs and guns, and arrested several people. Two days later, officers returned to the house on the report of a double homicide. They found Brown's body in a hallway outside the bathroom. Brown had suffered two gunshot wounds to the left side of his head, one of which was a contact wound. They also found Wilson's body on the floor of a nearby bedroom. She had suffered a single contact gunshot wound to the back of her head.

During the investigation, police identified Angelo, Little Pat, and Little Pat's friend, Maurice Williams Jr. (Little Reese), as potential suspects. In a police interview, Little Pat first denied being at the house the night of the murders. But Little Pat later

admitted he and Angelo were there, and he pointed to Angelo as the shooter. The State charged Angelo with two counts of first-degree murder. Angelo was arrested in Missouri about a week after the murders and extradited to Kansas several months later.

At Angelo's trial, the State presented evidence that the owner of the Haskell house had agreed to rent it to Little Pat and his friends for several months to prevent the house from going into foreclosure. Little Pat, Little Reese, and others used the house to buy and sell drugs, and they also partied there. The State also presented evidence that a ring belonging to Angelo went missing before the murders. Brown was the last person known to have the ring. Angelo's girlfriend had also accused Brown of propositioning her.

The State's case relied most heavily on the testimony of four witnesses: Curtis Brooks, Maurice Williams Sr., Little Pat, and Little Reese.

Brooks, who was staying at the Haskell house with Brown and Wilson, testified he was at the house with the victims when Angelo and Little Pat came over. Both Angelo and Little Pat seemed upset. Little Pat immediately went upstairs while Angelo retrieved something from a vent. At trial, Brooks testified that he did not know what Angelo retrieved from the vent. But at preliminary hearing, Brooks said Angelo had retrieved a revolver. Angelo then asked Brooks where Brown was located. Brooks told Angelo that Brown was in the basement. Angelo instructed Brooks to direct Brown to the bathroom whenever he came upstairs. Brooks complied. Little Pat then came back downstairs, and Brooks told him Angelo and Brown were in the bathroom.

Brooks said he was afraid Little Pat had come to the house to collect money Brooks owed him. So Brooks asked another person at the house for a ride to Brooks' nephew's house. When Brooks left the Haskell house, Angelo, Brown, and Little Pat were all in the bathroom with the door closed. At his nephew's, Brooks requested a gun for protection. His nephew did not have a gun but offered to cover Brooks' debt. Brooks then

6

returned to the Haskell house after being gone about 10 minutes. When Brooks opened the door, he saw two bodies lying on the floor. Brooks immediately returned to his nephew's house.

Williams testified he was at Brooks' nephew's house the night of the murders. Brooks came over saying something was wrong with Brown, and Brown was lying on the floor of the Haskell house. Williams drove to the Haskell house. When he looked in the window, he saw someone lying on the floor. He went inside and saw Brown had been shot in the head. He also saw a woman, who had also been shot, lying in the bedroom. He left the house and drove to a nearby gas station to call the police.

Little Pat testified that Angelo drove him and Little Reese to the Haskell house on the night of the murders. Little Pat and Little Reese both went to the house to retrieve some of their property. But Little Pat was unsure why Angelo wanted to go with them. Angelo parked around the corner from the house, and he and Little Pat got out. Once in the house, Little Pat immediately went upstairs. He looked around for his and Little Reese's property for about 10 minutes. When he went back downstairs, he heard a loud noise, and saw Brown slump onto Angelo in the hallway outside the bathroom. Little Pat fled the house. As he ran to the car, he heard two more loud sounds.

Little Pat said he got back to the car shortly before Angelo. Inside the car, Little Pat heard Angelo mumble something, but he could not understand what Angelo said. Little Reese later told Little Pat that Angelo had said Brown was dead.

Finally, Little Reese testified he was arrested during the drug raid on the Haskell house and was not released from jail until the day of the murders. Angelo drove him and Little Pat over to the house. Little Reese stayed in the car while Angelo and Little Pat went inside. Little Reese asked them to retrieve his coat and his keys from the house. When they returned to the car about 10 to 15 minutes later, Little Reese heard Angelo say

7

Brown was dead. Little Reese later asked Little Pat what had happened. Little Pat said he heard gunshots and saw Brown slump onto Angelo. Little Reese later overheard Little Pat tell Angelo over the phone that he was not going to jail for something he did not do.

While this witness testimony provided the evidentiary foundation for the State's theory of the case, the State also introduced certain forensic evidence. None of the DNA evidence presented at trial linked Angelo to the shooting. A forensic scientist testified she performed DNA testing on biological material found on four items collected at the crime scene—two .380 caliber cartridge cases, a swab of blood taken from the living room floor, and a swab of blood taken from the hallway wall. No DNA profile was obtained from the first cartridge case. The second cartridge case contained a partial DNA profile matching victim Wilson. Both the swab from the living room floor and the swab from the wall contained a DNA profile consistent with victim Brown. Investigators collected other items from the scene for possible DNA testing, including a beer bottle, a sexual assault kit from each victim, and a stocking cap. But the forensic scientist did not test those items because she, along with investigators and prosecutors, found them to be nonprobative.

Angelo's first trial ended in a hung jury. At his second trial, the jury convicted him of two counts of first-degree murder. This court affirmed his convictions on direct appeal. *State v. Angelo*, 287 Kan. 262, 197 P.3d 337 (2008). Angelo has since filed several postconviction motions. See *Angelo v. State*, No. 123,237, 2022 WL 569738 (Kan. App. 2022) (unpublished opinion); *Angelo v. State*, No. 109,660, 2014 WL 1096834 (Kan. App. 2014) (unpublished opinion). The only relief he has obtained is a remand for resentencing after the Court of Appeals found his original sentence was illegal. 2014 WL 1096834, at *4-5. After resentencing, we affirmed his new sentence on appeal. *State v. Angelo*, 306 Kan. 232, 236, 392 P.3d 556 (2017).

In his most recent motion, Angelo petitioned for postconviction DNA testing under K.S.A. 2021 Supp. 21-2512. In that petition, he asked for DNA testing of: (1) the clothes he wore on the day of the murders; (2) the alleged murder weapon; (3) residue from his hands; and (4) the victims' clothing.

In response, the State noted that Angelo was in Missouri custody for nearly four months after the murders before he was extradited to Kansas. Thus, the State never had custody of the clothes he wore on the day of the murders. Likewise, law enforcement never recovered any guns in connection with the double homicide, so there were no guns to test. And the State did not collect any residue from Angelo's hands because he was in Missouri custody for several months after the murders.

As for the victims' clothing, the State conceded these items remained in State custody. But it argued DNA testing of the clothing would not produce noncumulative, exculpatory evidence. The State explained that the victims lived in a home with several other people. And the residents hosted parties and sold drugs from the home, which meant there were often other visitors at this location. If the DNA of someone other than Angelo or the victims were found on the victims' clothing, the State argued the test results would establish only that the person may have had contact with the victims at an unknown time. It would not tend to prove that the person was the shooter.

The district court denied Angelo's petition without a hearing. The court found the State had only the victims' clothing in its custody and DNA testing of the clothing would not produce exculpatory evidence.

Angelo appeals the district court's denial of his petition. Jurisdiction is proper. K.S.A. 2021 Supp. 22-3601(b)(4) (right to appeal off-grid convictions to Supreme Court).

9

Angelo claims the district court erred by summarily denying his petition for postconviction DNA testing. He does not challenge the district court's finding that only the victims' clothing satisfied the threshold requirements for postconviction DNA testing under K.S.A. 2021 Supp. 21-2512(a). Instead, he argues only that the district court erroneously concluded that testing biological material on the victims' clothing could not produce exculpatory evidence. And at oral argument, appellant's counsel confirmed Angelo had narrowed his request for postconviction DNA testing to biological material on victim Brown's clothing only. As such, our analysis similarly focuses on the request to test biological material on this clothing.

Angelo argues DNA testing of the biological material from the victim's clothing would show the lack of his DNA, and such results would undermine Little Pat's trial testimony inculpating Angelo in the double murder and tend to prove Angelo was not the shooter. Angelo also contends the exculpatory character of these test results would be enhanced if the DNA profile also matched one of the witnesses who had opportunity and motive to commit the crimes.

The State argues summary denial of Angelo's petition was proper because the statute permits testing of biological material only and Angelo failed to carry his burden to prove biological material was present on the victim's clothing. The State also argues that if biological material is present on the victim's clothing, then the district court properly concluded that DNA test results would not be exculpatory.

To resolve these competing arguments, we first identify the scope of our review and the controlling legal framework. Second, we interpret K.S.A. 2021 Supp. 21-2512 to address the State's argument that Angelo failed to show the existence of biological

material on the victim's clothing. Finally, we review and reverse the district court's ruling that DNA testing of biological material on the victim's clothing could not produce exculpatory evidence.

I.    *Standard of Review and Legal Framework*

When a district court summarily denies a petition for postconviction DNA testing, its adjudication of the petition is based on the files (including the parties' pleadings), record of the underlying trial, and any legal arguments from a nonevidentiary hearing. Thus, appellate courts are in just as good a position as the district court to assess the merits of the petition, and our review is unlimited. *State v. Lackey*, 295 Kan. 816, 819, 286 P.3d 859 (2012). This appeal also requires us to interpret K.S.A. 2021 Supp. 21-2512. The interpretation of a statute presents a question of law over which we have unlimited review. *Lackey*, 295 Kan. at 819-20.

The right to postconviction DNA testing is defined by statute. K.S.A. 2021 Supp. 21-2512 provides:

"(a) Notwithstanding any other provision of law, a person in state custody, at any time after conviction for murder in the first degree as defined by K.S.A. 21-3401, prior to its repeal, or K.S.A. 2021 Supp. 21-5402, and amendments thereto, or for rape as defined by K.S.A. 21-3502, prior to its repeal, or K.S.A. 2021 Supp. 21-5503, and amendments thereto, may petition the court that entered the judgment for forensic DNA testing (deoxyribonucleic acid testing) of any biological material that:

(1) Is related to the investigation or prosecution that resulted in the conviction;
(2) is in the actual or constructive possession of the state; and
(3) was not previously subjected to DNA testing, or can be subjected to retesting with new DNA techniques that provide a reasonable likelihood of more accurate and probative results.

"(b)(1) The court shall notify the prosecuting attorney of a petition made under subsection (a) and shall afford the prosecuting attorney an opportunity to respond.

(2) Upon receiving notice of a petition made under subsection (a), the prosecuting attorney shall take such steps as are necessary to ensure that any remaining biological material that was secured in connection with the case is preserved pending the completion of proceedings under this section.

"(c) The court shall order DNA testing pursuant to a petition made under subsection (a) upon a determination that testing may produce noncumulative, exculpatory evidence relevant to the claim of the petitioner that the petitioner was wrongfully convicted or sentenced.

"(d) The cost of DNA testing ordered under subsection (c) shall be borne by the state or the petitioner, as the court may order in the interests of justice, if it is shown that the petitioner is not indigent and possesses the means to pay.

"(e) The court may at any time appoint counsel for an indigent applicant under this section.

"(f)(1) Except as provided in subsection (f)(3), if the results of DNA testing conducted under this section are unfavorable to the petitioner, the court:

(A) Shall dismiss the petition; and
(B) in the case of a petitioner who is not indigent, may assess the petitioner for the cost of such testing.

(2) If the results of DNA testing conducted under this section are favorable to the petitioner and are of such materiality that a reasonable probability exists that the new evidence would result in a different outcome at a trial or sentencing, the court shall:

(A) Order a hearing, notwithstanding any provision of law that would bar such a hearing; and

12

(B) enter any order that serves the interests of justice, including, but not limited to, an order:

(i) Vacating and setting aside the judgment;
(ii) discharging the petitioner if the petitioner is in custody;
(iii) resentencing the petitioner; or
(iv) granting a new trial.

(3) If the results of DNA testing conducted under this section are inconclusive, the court may order a hearing to determine whether there is a substantial question of innocence. If the petitioner proves by a preponderance of the evidence that there is a substantial question of innocence, the court shall proceed as provided in subsection (f)(2).

"(g) Nothing in this section shall be construed to limit the circumstances under which a person may obtain DNA testing or other postconviction relief under any other provision of law."

Together, these provisions contemplate at least two possible decision points for a district court in the adjudication of a petition for postconviction DNA testing: (1) whether testing should be ordered in the first instance under subsection (c); and (2) if testing is ordered, the appropriate disposition or remedy under subsection (f) depending on the nature of the test results.

Because the district court summarily denied Angelo's petition and did not order DNA testing, we focus on those provisions relevant to the first decision point—whether testing shall be ordered. In deciding whether to order testing in the first instance, the district court first determines whether the biological material sought to be tested meets the criteria set forth in K.S.A. 2021 Supp. 21-2512(a)(1)-(3). *Lackey*, 295 Kan. at 820. If those criteria are met, the district court then considers whether "testing may produce noncumulative, exculpatory evidence relevant to the claim of the petitioner that the

13

petitioner was wrongfully convicted or sentenced." K.S.A. 2021 Supp. 21-2512(c). If met, then the district court "shall order DNA testing" of the biological material specified in the petition. K.S.A. 2021 Supp. 21-2512(c); 295 Kan. at 821.

As for K.S.A. 2021 Supp. 21-2512(c)'s requirement that the potential evidence be "noncumulative," "[w]e have defined that term's opposite, i.e., cumulative evidence, as 'evidence of the same kind to the same point, and whether it is cumulative is to be determined from its kind and character, rather than its effect.'" *State v. George*, 308 Kan. 62, 71-72, 418 P.3d 1268 (2018) (quoting *State v. Rodriguez*, 295 Kan. 1146, 1158, 289 P.3d 85 [2012]); see also Black's Law Dictionary 479 (11th ed. 2019) ("[Of evidence] tending to prove the same thing <cumulative testimony>."). Thus, noncumulative evidence is the converse—that is, evidence "not of the same kind and character or not tending to prove the same thing." *George*, 308 Kan. 62, Syl. ¶ 4.

As for K.S.A. 2021 Supp. 21-2512(c)'s requirement that the potential evidence also be "exculpatory," we have defined "exculpatory evidence" as evidence that "simply '"tends to disprove a fact in issue which is material to guilt or punishment."'" *State v. Johnson*, 299 Kan. 890, 894, 327 P.3d 421 (2014) (quoting *Lackey*, 295 Kan. at 823). Evidence need not be exonerating to be exculpatory—that is, the evidence need not definitively establish a criminal defendant's innocence. *George*, 308 Kan. at 67; *Lackey*, 295 Kan. at 823. It is enough that the evidence tends to establish a criminal defendant's innocence, even if it does so by only the smallest margin. *George*, 308 Kan. at 71; *Lackey*, 295 Kan. at 823.

When determining whether evidence is exculpatory under K.S.A. 2021 Supp. 21-2512(c), we have made clear that the district court should not weigh the evidence or consider its potential effect on the verdict. "That this potentially exculpatory evidence may be of very little evidentiary value does not matter at this stage [when the court is deciding whether to order testing in the first instance]." *George*, 308 Kan. at 68. It is only

14

after DNA testing has been completed that a court may be called on under K.S.A. 2021 Supp. 21-2512(f) to make "'a "probabilistic determination about what reasonable, properly instructed jurors would do" with the new evidence in light of the totality of the circumstances.'" *State v. Hernandez*, 303 Kan. 609, 618, 366 P.3d 200 (2016) (quoting *Lackey*, 295 Kan. at 824). "But the statute does not contemplate that exercise of discretion in determining whether to order the testing in the first instance." *Lackey*, 295 Kan. at 824.

II. *The Allegations in Angelo's Petition Satisfied the Threshold Requirements for Postconviction DNA Testing, and Angelo's Failure to Make an Evidentiary Showing that Biological Material Is Present on the Victim's Clothing Does Not Provide an Independent Basis to Affirm the Summary Denial of Angelo's Petition*

Here, the district court summarily denied Angelo's petition because DNA testing of any biological material would not produce exculpatory results. Nevertheless, the State argues summary denial of the petition was proper because Angelo failed to show biological material exists on the items he sought to test. According to the State, K.S.A. 2021 Supp. 21-2512 permits DNA testing of known biological material only—it does not permit testing to determine whether an item contains biological material. The State believes this interpretation of the statute places the burden on Angelo to show biological material is present on any physical evidence an inmate identifies for testing in the petition—here, victim Brown's clothing. Because Angelo purportedly failed to carry this evidentiary burden, the State argues the district court properly denied the petition without an evidentiary hearing. In other words, the State contends the district court's ruling was right, albeit for a different reason. See *State v. Vasquez*, 287 Kan. 40, 59, 194 P.3d 563 (2008) (Kansas Supreme Court may affirm a district court's ruling "if it is right even for the wrong reason.").

The State's argument requires us to interpret K.S.A. 2021 Supp. 21-2512 to identify the pretesting procedures and burdens of the respective parties leading up to the district court's decision whether to order DNA testing under K.S.A. 2021 Supp. 21-2512(c). As discussed in the following sections of the opinion, our statutory interpretation confirms the State's argument is not without merit—the statute authorizes testing of biological material only, and as the moving party, the burden is on Angelo to show the existence of biological material satisfying the threshold requirements for testing under K.S.A. 2021 Supp. 21-2512(a)(1)-(3).

But as we will explain, our statutory interpretation also reveals the Legislature contemplated a three-part process for the pretesting phase of the proceedings. And that three-part process is not set out in any of our prior decisions. Because neither the parties nor the district court had the benefit of this statutory interpretation at the time of the district court proceedings, those proceedings did not conform to this three-part procedure.

Thus, while we find the State's argument does not provide an independent basis to affirm the summary denial of Angelo's petition, it does demonstrate the propriety of a remand for further proceedings consistent with our statutory interpretation. To support this conclusion, we first interpret the various provisions of the statute to identify the procedures governing the pretesting phase of the proceedings. Then, we apply this statutory interpretation to circumstances at hand.

A. *K.S.A. 2021 Supp. 21-2512 Limits the Scope of Permissible Testing and Contemplates a Three-Part Process for the Pretesting Phase of the Proceedings*

We begin by interpreting the statute to define the permissible scope of postconviction DNA testing and to identify the procedures governing the pretesting phase of the proceedings.

16

1.  *Rules of Statutory Interpretation*

The rules governing statutory interpretation are well-established:

"The most fundamental rule of statutory construction is that the intent of the Legislature governs if that intent can be ascertained. In ascertaining this intent, we begin with the plain language of the statute, giving common words their ordinary meaning. When a statute is plain and unambiguous, an appellate court should not speculate about the legislative intent behind that clear language, and it should refrain from reading something into the statute that is not readily found in its words. But if a statute's language is ambiguous, we will consult our canons of construction to resolve the ambiguity. [Citations omitted.]" *Johnson v. U.S. Food Service*, 312 Kan. 597, 600-01, 478 P.3d 776 (2021).

But even when the language of the statute is clear, we still consider various provisions of an act *in pari materia* to reconcile and bring those provisions into workable harmony, if possible. *Neighbor v. Westar Energy, Inc.*, 301 Kan. 916, 919, 349 P.3d 469 (2015); *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 918, 296 P.3d 1106 (2013). "Thus, the doctrine of *in pari materia* has utility beyond those instances where statutory ambiguity exists. It can be used as a tool to assess whether the statutory language is plain and unambiguous in the first instance, and it can provide substance and meaning to a court's plain language interpretation of a statute." *Bruce v. Kelly*, 316 Kan. 218, 224, 514 P.3d 1007 (2022).

2.  *The Statute Limits Testing to Biological Material, Not Physical Evidence, and Contemplates a Three-part Procedure Leading Up to the District Court's Decision Whether to Order Testing*

K.S.A. 2021 Supp. 21-2512 provides "an opportunity for exoneration to innocent individuals convicted of severe crimes." *State v. Cheeks*, 298 Kan. 1, 6, 310 P.3d 346

(2013), *overruled on other grounds by State v. LaPointe*, 309 Kan. 299, 434 P.3d 850 (2019). The statute accomplishes this legislative purpose by using "DNA testing to help determine if one who is in state custody 'was wrongfully convicted or sentenced' and if so, to vacate and set aside the judgment, discharge the person if in custody, resentence, or grant a new trial." *State v. Denney*, 278 Kan. 643, 654, 101 P.3d 1257 (2004).

But the scope of K.S.A. 2021 Supp. 21-2512 is not unlimited. Its "legislatively-created procedures evince a laudable, yet limited, effort to provide for postconviction DNA testing under narrow circumstances." *State v. Denney*, 283 Kan. 781, 793-94, 156 P.3d 1275 (2007). These limitations and the procedures governing the pretesting phase of the proceedings are largely contained in K.S.A. 2021 Supp. 21-2512(a)-(c). Those subsections describe in chronological order a three-part procedure governing the pretesting phase of the proceedings, and each subsection reveals important substantive limits to the right to postconviction DNA testing.

First, K.S.A. 2021 Supp. 21-2512(a) identifies the class of individuals eligible to pursue postconviction DNA testing and the threshold requirements for such testing. Subsection (a) provides that inmates convicted of first-degree murder or rape may petition "for forensic DNA testing . . . of any biological material" when such material:

"(1) Is related to the investigation or prosecution that resulted in the conviction;

"(2) is in the actual or constructive possession of the state; and

"(3) was not previously subjected to DNA testing, or can be subjected to retesting with new DNA techniques that provide a reasonable likelihood of more accurate and probative results." K.S.A. 2021 Supp. 21-2512(a).

To state a claim for postconviction DNA testing, a petition must allege facts sufficient to meet these requirements. Thus, when addressing a petition under K.S.A. 2021 Supp. 21-

18

2512, the district court first determines whether biological material on the items sought to be tested meet the criteria in K.S.A. 2021 Supp. 21-2512(a)(1)-(3). *Lackey*, 295 Kan. at 820.

The plain language of this subsection contains two significant limitations. First, it limits the class of eligible petitioners to those who are in custody after being convicted of first-degree murder or rape. See K.S.A. 2021 Supp. 21-2512(a). Second, and more pertinent to the issue at hand, it limits the scope of testing to "*any biological material*" that is related to the case, in the actual or constructive possession of the State, and which was not previously tested or can be retested with new DNA techniques that are more accurate and probative. (Emphasis added.) Eligible petitioners may request DNA testing of biological material only. The plain language of subsection (a) does not contemplate or provide for testing of other physical evidence to determine whether biological material is present. And K.S.A. 2021 Supp. 21-2512(a) requires that a petition for postconviction DNA testing allege that biological material satisfying the threshold requirements for testing exists.

Once a petition for postconviction DNA testing has been filed, subsection (b) identifies the appropriate procedures and duties of the prosecution and district court:

> "(b)(1) The court shall notify the prosecuting attorney of a petition made under subsection (a) and shall afford the prosecuting attorney an opportunity to respond.

> (2) Upon receiving notice of a petition made under subsection (a), the prosecuting attorney shall take such steps as are necessary to ensure that any remaining biological material that was secured in connection with the case is preserved pending the completion of proceedings under this section." K.S.A. 2021 Supp. 21-2512(b).

The plain language of subsection (b) first requires the district court to notify the prosecuting attorney of the petition for postconviction DNA testing. "The purpose of the

19

notification requirement is at least two-fold: First, it gives the State an opportunity to respond to the request; and, second, it provides a warning to the State that the biological material in question must be preserved." *Lackey*, 295 Kan. at 821.

As for the State's preservation duty, once the prosecution has notice of the petition, it must take necessary steps to ensure that "biological material that was secured in connection with the case is preserved." K.S.A. 2021 Supp. 21-2512(b)(2). This statutory language is important in two respects. First, like subsection (a), it focuses on "biological material" specifically, rather than items of evidence generally. Second, the plain language requires the State to preserve only biological material that "*was secured* in connection with the case." K.S.A. 2021 Supp. 21-2512(b). The Legislature's use of the past-tense phrase, "was secured," makes clear the Legislature intended the State only preserve the "biological material" it previously secured in its investigation or prosecution of the defendant. See https://www.merriam-webster.com/dictionary/secured (defining verb "secure" "to relieve from exposure to danger: act to make safe against adverse contingencies"); see also https://www.oxfordlearnersdictionaries.com/us/definition/english/secure_1?q=secured (identifying "secured" as the past simple use of the term "secure"). The plain language cannot be read to impose a duty on the State to call its crime scene investigators back in to examine or re-examine the physical evidence and determine whether any of those items contain biological material that the prosecution had not previously "secured."

As for the State's opportunity to respond, when the pretesting provisions are read together in harmony, it is apparent the Legislature intended the State's response to identify all biological material it previously secured in connection with the case. As noted, under subsection (a), a petition must generally allege that biological material exists, and such material satisfies the threshold requirements for testing. Under subsection (b), the State must preserve any remaining biological material that it previously secured in connection with the case, and the State has an opportunity to

20

respond to the petition. Only after the parties have submitted these pleadings does the statute then authorize the district court to decide whether testing shall be ordered because it "may produce noncumulative, exculpatory evidence relevant to" petitioner's wrongful conviction claim. K.S.A. 2021 Supp. 21-2512(c); *Lackey*, 295 Kan. at 821.

The very purpose of these statutory provisions would be undermined if subsection (b) did not require that the State's response identify the biological material it previously secured in connection with the case. Without this information, neither the petitioner nor the district court would be alerted to the possibility the State controverts petitioner's allegations regarding the existence of biological material. And the district court could find petitioner's allegations to have been deemed admitted even though the State believes no such biological material exists. The district court could then proceed to subsection (c) and determine whether testing should be ordered without first conducting an evidentiary hearing to resolve (the undisclosed) factual dispute regarding the existence of biological material. In turn, the district court could order testing under subsection (c), even though the items to be tested may contain no biological material—an order that would contravene the Legislature's clear intention to limit postconviction DNA testing to biological material only.

Reading the plain language of these subsections together and in harmony, K.S.A. 2021 Supp. 21-2512 creates a three-step process leading up to the district court's first decision point—whether to order DNA testing. First, the petition must allege that biological material exists and satisfies the threshold requirements for testing under K.S.A. 2021 Supp. 21-2512(a). Second, once the State has notice of the petition, it must preserve any remaining biological material that it previously "secured in connection with the case" and identify such biological material in its response. K.S.A. 2021 Supp. 21-2512(b)(2). Finally, once the pleadings have been filed, the parties will either agree or dispute that biological material satisfying the threshold requirements for testing under K.S.A. 2021 Supp. 21-2512(a) exists. If the parties agree such biological material exists, then they can

21

proceed to argue whether testing will produce noncumulative, exculpatory evidence compelling the district court to order testing under K.S.A. 2021 Supp. 21-2512(c). But if they continue to dispute the existence of such biological material, then they can present evidence to the district court for appropriate fact-finding. In that situation, the petitioner, as the proponent of DNA testing, bears the burden to prove the existence of such biological material. See *In re K.E.*, 294 Kan. 17, 23, 272 P.3d 28 (2012) ("movant generally bears the burden of proof on a motion"). With this statutory interpretation in mind, we apply the three-part procedure to the facts at hand.

B. *The Pretesting Procedures in K.S.A. 2021 Supp. 21-2512 Do Not Support the District Court's Decision to Summarily Deny Angelo's Petition*

To address the State's argument that Angelo failed to meet his burden to show the existence of biological material satisfying the threshold requirements for testing, we apply the three-part statutory procedure (outlined above) to the district court proceedings.

1. *Step One—Angelo Stated a Claim for Postconviction DNA Testing*

We first analyze the sufficiency of the allegations in Angelo's petition. Our precedent makes clear that an eligible inmate need not specifically allege how DNA testing would produce noncumulative, exculpatory evidence. Instead, K.S.A. 2021 Supp. 21-2512

"merely requires the prisoner to allege that the evidence is related to the investigation or prosecution of his or her conviction, that the State has possession or constructive possession of the evidence, and that the evidence was not previously subjected to DNA testing or that it could be tested using new DNA testing techniques." *Bruner v. State*, 277 Kan. 603, 606, 88 P.3d 214 (2004).

22

While the pleading requirement set forth in *Bruner* generally remains true, we must provide some clarification in light of our statutory interpretation. A petition for postconviction DNA testing must still generally allege that the "evidence" is related to the investigation, is in the possession of the State, and has not been tested previously or is eligible for retesting. But the "evidence" referenced in *Bruner* necessarily refers to "biological material" specifically because K.S.A. 2021 Supp. 21-2512 does not authorize testing of physical evidence to determine whether biological material is present. Thus, our point of clarification is that when an inmate's petition requests testing of other physical evidence, it must also contain allegations sufficient to establish that biological material is present on that physical evidence.

But this pleading requirement is not rigorous. In *Hernandez*, the petitioner sought to test various items of physical evidence, including blankets, sheets, towels, and a box of condoms. He also alleged that he believed those items of physical evidence contained biological material. The State's response did not controvert this latter allegation. And we held the petition alleged facts sufficient to satisfy the threshold requirements for testing under K.S.A. 2021 Supp. 21-2512(a). *Hernandez*, 303 Kan. at 615.

Here, like in *Hernandez*, Angelo requested DNA testing of physical evidence—victim Brown's clothing. And also like *Hernandez*, he alleged his belief that biological material was present on that item:

> "In the States Ap[p]ellee Brief (Pg. 35) first paragraph (quoting) 'In fact, as the District Court noted the State could have spent much more time putting on evidence of the same [additional DNA evidence] but chose not to.' Jennifer S. Tatum, Assistant District Attorney[']s above statement*, petitioner is left to believe State prosecutor possibly withheld* [emphasis added] *exculpatory evidence, or had in her constructive possession some type of biological material that could have been tested or already had been tested*." (Emphasis added.).

23

Angelo couples these allegations with others claiming that DNA testing of the victim's clothing will yield exculpatory results. These allegations are premised on the belief that those items of evidence contain biological material amenable to forensic DNA testing. Angelo further alleged that these items (and the material on such items) are related to the case, are in the State's possession, and had not been previously tested.

As a pro se petitioner, we liberally construe Angelo's petition and the allegations in it. *Bruner*, 277 Kan. at 605. So construed, Angelo's petition sufficiently alleged the existence of biological material on the victim's clothing and that this material satisfied the threshold requirements for testing under K.S.A. 2021 Supp. 21-2512(a). Thus, under the first step of the three-part process governing the pretesting phase of the proceeding, Angelo's petition stated a claim for postconviction DNA testing.

2.   *Step Two—The State's Response Did Not Disclose a Factual Dispute Regarding the Existence of Biological Material Sought to Be Tested*

Under the second step of the pretesting process, the State responds to the petition. Under our interpretation of K.S.A. 2021 Supp. 21-2512, the State's response should have identified the biological material it previously secured in connection with the case. Of course, the State did not have the benefit of this statutory interpretation at the time it filed the response. And not surprisingly, the response did not identify such biological material. Nor did it specifically controvert Angelo's allegations that biological material was present on the victim's clothing. Without this information, the district court was not alerted to the fact the State disputed Angelo's allegations that the items he sought to test contained biological material.

24

### 3. *Step Three—Without Disclosure of a Factual Dispute, the District Court Could Not Know an Evidentiary Hearing Was Necessary*

The State's failure to disclose a factual dispute regarding the existence of biological material on victim Brown's clothing also impacts the third and final step of the pretesting process. In this final stage, the parties will either agree that all biological material has been identified or dispute this fact. If the parties agree, then they can proceed to argue whether testing should be ordered under K.S.A. 2021 Supp. 21-2512(c). But if the parties dispute that biological material exists, then they can present evidence to the district court for fact-finding. Here, because the State's response did not identify the biological material it had previously secured or specifically deny the allegations regarding the existence of biological material on victim Brown's clothing, the district court could not have known the proper course was to conduct an evidentiary hearing for fact-finding to determine whether the victim's clothing contained biological material.

In sum, Angelo's petition stated a claim for postconviction DNA testing and the State's response did not disclose a factual dispute as to the existence of biological material on Brown's clothing. Without that disclosure, the State's response did not trigger Angelo's burden to prove up his allegation that biological material was present. Nor was Angelo otherwise given the opportunity to make this showing because the district court did not hold an evidentiary hearing. For these reasons, we cannot affirm the district court's summary denial of Angelo's petition on the alternative theory that Angelo failed to meet his burden to show the existence of biological material satisfying the threshold requirements for testing.

Nevertheless, the State's arguments on appeal suggest there may be a factual dispute regarding the presence of biological material on the victim's clothing. If the State had the benefit of our statutory interpretation at the time, then its response would have disclosed this dispute and the need for an evidentiary hearing. Because we conclude in

25

the following section that the district court erred by concluding that testing biological material on the victim's clothing would not produce exculpatory evidence, these circumstances demonstrate the propriety of a remand for further proceedings consistent with our statutory interpretation.

III. *The District Court Erred by Concluding that Testing Would Not Produce Exculpatory Evidence*

Finally, we reach Angelo's challenge to the district court's ruling that testing would not have produced exculpatory evidence. As previously noted in section I, we apply the same statutory framework that controlled the district court's analysis below. Thus, we exercise unlimited review to determine whether DNA testing of the presumed biological material may have yielded noncumulative, exculpatory evidence under K.S.A. 2021 Supp. 21-2512(c).

Before addressing the merits of Angelo's argument, we briefly pause to address two other issues relevant to the scope of our review. First, the district court found the victims' clothing was the only item Angelo sought to have tested that met the threshold criteria for postconviction DNA testing. See K.S.A. 2021 Supp. 21-2512(a)(1)-(3). The court found the other items listed in Angelo's petition (Angelo's clothing from the day of the murders, the murder weapon, and any residue collected from Angelo's hands) did not meet these criteria because those items were not in the State's possession. See K.S.A. 2021 Supp. 21-2512(a)(2) (An inmate convicted of first-degree murder "may petition the court . . . for forensic DNA testing [] of any biological material that . . . is in the actual or constructive possession of the state."). Angelo does not challenge those findings on appeal. Thus, we affirm the district court's ruling that these other items failed to meet the threshold requirements for testing under K.S.A. 2021 Supp. 21-2512(a).

26

Second, as discussed above, the district court was not alerted to any factual dispute about the presence of biological material on victim Brown's clothing, and thus it simply presumed biological material was present for the purposes of its ruling. We will likewise presume biological material is present on Brown's clothing for the limited purpose of testing the district court's legal conclusion. But nothing in this opinion should be construed to affirm or support the validity of the presumption that biological material is present as a matter of fact or to limit argument or evidence on the question in subsequent proceedings.

As for the district court's judgment, it ruled that testing the presumed biological material on the victims' clothing would not produce exculpatory evidence. It found "the DNA of a large number of people could be present in the house, [so t]he fact that another party's DNA was present on the clothes of either deceased party would simply not lead to the conclusion that the party was the shooter." Likewise, the court found that test results showing the absence of Angelo's DNA would not tend to show that someone other than Angelo was the shooter. The district court explained "[t]he consensus of the [trial] testimony is that Angelo was present and ran from the scene very soon after noises/shots were heard. His own son [Little Pat] places him at the scene in direct contact with one of the victims." Based on these findings the district court summarily denied Angelo's petition.

We conclude the district court erred by summarily denying Angelo's petition for testing of the presumed biological material on Brown's clothing for two reasons. First, the district court erred by weighing the potential test results against other incriminating evidence adduced at trial. Second, even if the test results are not exonerating, they may be probative of the identity of the shooter—a disputed question of material fact at Angelo's trial. And favorable test results could be used to impeach the testimony of Little Pat, the State's only eyewitness to the shootings. Under the facts unique to this case, such

27

evidence could be exculpatory under our precedent construing K.S.A. 2021 Supp. 21-2512(c). And this evidence would not be cumulative to the other forensic evidence introduced at trial.

A. *The District Court Improperly Weighed the Evidence to Summarily Deny Angelo's Petition*

In summarily denying Angelo's petition, the district court focused on the potential for any DNA test results to be exculpatory. But in conducting this analysis, the court appears to have weighed the evidence. The district court found "[t]he consensus of the [trial] testimony is that Angelo was present and ran from the scene very soon after noises/shots were heard. His own son [Little Pat] places him at the scene in direct contact with one of the victims." And given the strength of this incriminating trial testimony, the district court concluded that test results confirming the absence of Angelo's DNA (or the presence of a third party's DNA) would not prove Angelo was not the shooter.

But when deciding whether K.S.A. 2021 Supp. 21-2512(c) requires the court to order testing in the first instance, the district court's inquiry is limited to whether the results may produce noncumulative, exculpatory evidence. The district court does not have discretion at this stage of the proceedings to consider the weight of the exculpatory evidence or its potential effect on the verdict. *Lackey* illustrates this point.

Lackey was convicted of first-degree premeditated murder and rape. At trial, the State presented evidence that sperms cells found in the victim's vagina matched Lackey's DNA, and that Lackey could not be excluded as a contributor to the DNA profile from the victim's fingernail scrapings. Lackey later petitioned under K.S.A. 2021 Supp. 21-2512 for DNA testing of hairs found on the victim's body. The district court summarily denied Lackey's petition, and the Court of Appeals affirmed, finding "'DNA testing on the short hairs would not produce exculpatory evidence in this case when Lackey's DNA

28

was consistent with the DNA found in [the victim's] vagina and underneath her fingernails.'" *Lackey*, 295 Kan. at 823. We reversed the panel's decision, holding the Court of Appeals improperly weighed the evidence in determining whether DNA testing of the hairs would produce exculpatory evidence. 295 Kan. at 823-24.

*Lackey* confirms that the strength of the inculpatory trial evidence is not a relevant consideration in determining whether DNA test results may produce exculpatory evidence under K.S.A. 2021 Supp. 21-2512(c). Rather, at this stage, the focus of the inquiry is limited to whether such results may tend to prove or disprove a disputed material fact, even if the results would do so by only the slightest margin. See *George*, 308 Kan. at 68; *Haddock v. State*, 295 Kan. 738, 769, 286 P.3d 837 (2012). The district court may weigh the evidence only after testing has been ordered—when it makes a "'probabilistic determination about what reasonable, properly instructed jurors would do' with the new evidence in light of the totality of the circumstances" under K.S.A. 2021 Supp. 21-2512(f). *Lackey*, 295 Kan. at 824.

Thus, under K.S.A. 2021 Supp. 21-2512(c), the district court erred by considering whether other trial evidence convincingly established that Angelo was the shooter and whether the test results from the presumed biological material on Brown's clothing could adequately overcome that evidence.

B. *DNA Testing of the Presumed Biological Material from Brown's Clothing Could Produce Noncumulative, Exculpatory Evidence*

In reviewing the district court's conclusion that testing would not produce exculpatory evidence, we remain mindful that subsection (c) sets a low threshold for ordering DNA testing of biological material. A petitioner need not show with certainty that DNA testing of the specified items will produce noncumulative, exculpatory evidence. Instead, the possibility of generating such evidence will suffice. *Hernandez*,

303 Kan. at 617; see also K.S.A. 2021 Supp. 21-2512(c) ("The court shall order DNA testing" if "testing *may* produce noncumulative, exculpatory evidence." [Emphasis added.]). What is more, a petitioner need not specifically allege how the DNA testing would produce evidence that meets the standard set by K.S.A. 2021 Supp. 21-2512(c). *Lackey*, 295 Kan. at 824; *Bruner v. State*, 277 Kan. 603, 606, 88 P.3d 214 (2004). And as previously noted, test results need not be exonerating to be exculpatory. The potential DNA test results need only be probative of a material fact in issue at trial.

Thus, summary dismissal of a petition under K.S.A. 2021 Supp. 21-2512(c) is proper if the test results would be nonexculpatory as a matter of law. This low threshold for testing may permit a petitioner to engage in a "fishing expedition" for DNA evidence, but it is an expedition the Legislature has deemed worthwhile. 277 Kan. at 606.

1. *Testing May Produce Exculpatory Evidence*

Angelo argues DNA test results may show the lack of his DNA on the presumed biological material from Brown's clothing and the presence of a witness' DNA, and such evidence would be exculpatory. Angelo explains that Little Pat testified he saw Brown slump onto Angelo right after the shooting. From this testimony, Angelo infers that the physical contact created the opportunity for his biological material to transfer to Brown's clothing. Thus, Angelo claims test results showing the lack of his DNA in the presumed biological material on Brown's clothing would tend to impeach Little Pat's testimony and show Angelo was not the shooter. Angelo claims the exculpatory character of this evidence would be enhanced by the presence of the DNA of another witness at trial. This conclusion is especially true, according to Angelo, if the DNA profile matched Little Reese's or Little Pat's DNA because both had opportunity and motive to commit the murders.

In similar circumstances, we have held that DNA testing may produce exculpatory evidence. For example, in *Hernandez*, we held the lack of petitioner's DNA or the presence of a third-party's DNA in the biological material on items collected from the crime scene would be exculpatory evidence relevant to the identity of the perpetrator. There, petitioner was convicted of raping his 13-year-old daughter, C.H. Hernandez later petitioned for postconviction DNA testing of biological material on the bedding collected from C.H.'s bed and the bed Hernandez shared with his wife—the two locations where the sexual assaults occurred. The district court summarily denied the petition after a non-evidentiary hearing, and the Court of Appeals affirmed.

We reversed, explaining that test results confirming the lack of petitioner's DNA on the biological material from the bed sheets could be exculpatory:

> "[W]e disagree with the panel's assessment that the absence or presence of DNA from Hernandez, his wife, and/or C.H., in whatever combination, or in conjunction with third party DNA, could never tend to prove or disprove the materially disputed fact that sex acts between Hernandez and C.H. occurred in his bed or her bed. For instance, the presence of DNA from Hernandez and/or his wife on their bed, coupled with the absence of C.H.'s DNA, would tend to disprove that Hernandez sexually abused C.H. on that bed. Similarly, the presence of DNA from C.H. and/or her boyfriend on her bed, without any DNA from Hernandez, would be exculpatory evidence." *Hernandez*, 303 Kan. at 620.

We reached the same conclusion in *George*. There, petitioner was convicted of raping a woman in a gas station storeroom. George maintained a defense of mistaken identity. He later petitioned for postconviction DNA testing of hair samples police collected from the scene of the rape. We held that DNA test results showing the hair samples did not match George's DNA would be exculpatory for purposes of K.S.A. 2021 Supp. 21-2512:

31

"[E]ven if the testing of the hairs found at the spot where the rape occurred only revealed that George's DNA was not present, the results would be exculpatory because they would 'tend' to disprove his guilt. At a minimum, they would tend to show he had not been at that spot. . . . That this potentially exculpatory evidence may be of very little evidentiary value does not matter at this stage." *George*, 308 Kan. at 68.

In a concurring opinion, Justice Stegall emphasized that the presence of a third party's DNA at the crime scene was not probative of whether George had also been at that scene. Justice Stegall reasoned that proof that one person was in a place sometime in the past has no tendency to prove or disprove that another person was also in that place sometime in the past. Even so, Justice Stegall concurred in the decision because DNA testing of the hairs could produce marginally exculpatory evidence probative of the identity of the perpetrator, if the profile did not match George's DNA:

"The reason the DNA testing in this case has an ever-so-slight tendency to demonstrate George is not the perpetrator of this crime is [] because . . . the evidence— i.e., the only hairs found in the entire large, publicly accessible storeroom which also just happened to have been found at the precise location of the crime—creates the possibility of doubt as to the identity of the perpetrator." 308 Kan. at 77 (Stegall, J., concurring).

*Hernandez* and *George* suggest that where the identity of the perpetrator is in issue at trial, DNA testing of biological material from the items collected at the crime scene may produce exculpatory evidence where the results show the lack of petitioner's DNA coupled with the presence of a third party's DNA. See *Johnson*, 299 Kan. at 894 ("'DNA testing is intended to confirm or dispute the identity of individuals involved in or at the scene of a purported crime.' So DNA evidence may be exculpatory if it tends to establish innocence based on an individual's identity. [Citation omitted.]").

The facts unique to Angelo's petition confirm that *Hernandez* and *George* are apposite and DNA test results showing the absence of Angelo's DNA and the presence of

a witness' DNA on the presumed biological material from Brown's clothing would be exculpatory evidence under K.S.A. 2021 Supp. 21-2512(c).

First, the identity of the shooter was in issue at Angelo's trial. Angelo did not dispute that he was present at the scene on the night of the murders. Indeed, he called police shortly after the shooting and told them he had been at the Haskell house that night. But Angelo claimed Brown and Wilson were both alive when he left the house and denied that he was the shooter.

Second, Little Pat's trial testimony heightens the potential relevance of any biological material found on Brown's clothing. Little Pat testified that Brown slumped against Angelo after Angelo shot him. This physical contact suggests the possibility that Angelo's DNA transferred to Brown's clothing after the first shot was fired. If DNA testing of this presumed biological material revealed a profile matching Angelo's DNA, the district court would not have excluded the evidence as irrelevant. Indeed, such a test result would be highly probative of the identity of the shooter—the evidence would align with the State's theory of the case and corroborate Little Pat's account of the murders. So why would the opposite test result (no DNA from Angelo in the presumed biological material from Brown's clothing) not be probative of the identity of the shooter? Such a result would support Angelo's defense. It would rebut the State's theory of the case. And it could be used to impeach Little Pat's testimony. Little Pat's testimony (that Brown slumped onto Angelo after the shooting) creates a nexus between Angelo and Brown's clothing sufficient to conclude that testing the presumed biological material on that clothing may produce exculpatory evidence.

Granted, there are several, nonexculpatory explanations for a test result showing the lack of defendant's DNA in the presumed biological material from Brown's clothing. The contact may have been too brief for any biological material to transfer, clothing may have impeded the transfer of DNA, and so forth. But those explanations go to the weight

33

of the evidence. They do not deprive the evidence of all exculpatory value. Of course, as noted in section II, we have no confirmation that Brown's clothing contains biological material amenable for testing, which demonstrates the need for a remand for further proceedings. But presuming such biological material is present (as the district court did), we conclude test results may yield exculpatory evidence as a matter of law.

And if DNA testing not only showed the absence of Angelo's DNA but also the presence of a third party's DNA in the presumed biological material from Brown's clothing, then such results would enhance the exculpatory character of the evidence. This rationale is particularly true here if testing confirms the presence of Little Pat's or Little Reese's DNA.

The trial testimony established that Little Pat and Little Reese were at first suspects in the double homicide. Both Little Pat and Little Reese had the opportunity to commit the murders—both admitted to being at the house at the time of the shootings.

The trial evidence also showed Little Pat and Little Reese had potential motive for the killings. Little Pat and Little Reese were friends, and they, along with several associates, were selling drugs from the Haskell house. Police raided the home and seized drugs and other incriminating evidence two days before the murders. Police arrested several occupants during the raid, including Little Reese. But victim Wilson, who was present during the raid, was not arrested. This could have raised Little Reese's suspicion about Wilson's involvement with law enforcement. And the double homicide occurred on the very night Little Reese was released from jail, two days after police arrested him in the raid.

The raid on the Haskell house not only threatened Little Pat's and Little Reese's drug-selling operations and exposed them to potential imprisonment, but it also gave Brown a chance to steal from them. A witness at trial testified that after the raid, Brown

stole money and electronic equipment that belonged to Little Pat from the house. According to that witness, Little Pat was angry about the stolen property and had been looking for Brown. Another witness testified Little Pat came over to the house shortly after the raid wielding a baseball bat and demanding to know what had happened to his missing property. Brown and Wilson were at the house at the time, and Little Pat threatened them, even hitting a wall with the bat.

Jurors could have inferred from other circumstantial evidence that Little Pat and Little Reese had decided to pin the murders on Angelo. During Little Pat's police interview, he lied to investigators for hours, claiming he had an alibi. Eventually, Little Pat admitted he was at the house at the time of the shooting but identified his father, Angelo, as the shooter. During Little Reese's police interview, he originally denied that anyone had said anything about a shooting when Angelo and Little Pat returned to the car on the night of the double homicide. But later, Little Reese testified that when Angelo returned to the car, he said Brown was dead.

Given this trial evidence, DNA test results showing the presence of Little Pat's or Little Reese's DNA on the presumed biological material from Brown's clothing could tend to implicate them in the shooting. And when coupled with the absence of Angelo's DNA, such test results would tend to disprove Little Pat's identification of Angelo as the shooter. While this potential evidence may or may not exonerate Angelo, it has at least a slight tendency to disprove his guilt. That alone satisfies the statutory threshold for ordering DNA testing under K.S.A. 2021 Supp. 21-2512(c).

### 2. *DNA Testing May Produce Noncumulative Evidence*

The district court did not find that DNA testing would produce cumulative evidence. And the State does not take that position on appeal. Even so, we briefly address whether testing of the presumed biological material on Brown's clothing would produce

35

noncumulative evidence to ensure that our review of the petition under K.S.A. 2021 Supp. 21-2512(c) is complete and there is no alternative basis to affirm the district court ruling given the record before us. See *Vasquez*, 287 Kan. at 59 (Kansas Supreme Court may affirm a district court's ruling "if it is right even for the wrong reason.").

Angelo's trial was not devoid of DNA evidence. The State tested two cartridge cases and two swabs of blood collected at the scene, and this testing produced DNA profiles matching only victims Brown and Wilson. The forensic scientist also broadly affirmed that none of the items recovered from the scene and tested produced a profile matching Angelo's DNA.

But there is a crucial difference between those items the State tested and the presumed biological material on Brown's clothing. The trial evidence established a physical connection between Angelo and Brown's clothing. The evidence did not establish a similar connection between Angelo and any of the items the State tested.

At trial, Little Pat testified that he heard gunshots and then saw Brown slump onto Angelo. If true, this contact could have created the potential for Angelo's biological material to transfer to Brown's clothing. If DNA test results showed the presence of Angelo's DNA on Brown's clothing, that result would tend to corroborate Little Pat's testimony that Angelo was the shooter. On the other hand, if DNA test results showed the lack of Angelo's DNA, that result could be used to challenge Little Pat's account of the shootings and thus tend to show Angelo was not the shooter.

The same cannot be said for the other items the State tested. No one saw Angelo load the gun or move any cartridge cases after the shooting. No one testified that Angelo had bled on the wall or the floor. The testimony established no nexus between Angelo and the items the State submitted for testing.

36

Thus, results from a DNA test of the presumed biological material on Brown's clothing would be unique in their potential to either corroborate or contradict the State's eyewitness testimony. The State's DNA testing of the cartridges and blood stains did not possess the same potential to serve as impeachment evidence. See *George*, 308 Kan. 62, Syl. ¶ 4 (noncumulative evidence is evidence "not of the same kind and character or not tending to prove the same thing"). For these reasons, we conclude that DNA testing of the presumed biological material on Brown's clothing would not produce cumulative evidence. Those results may also be exculpatory because they would tend to disprove Little Pat's identification of Angelo as the shooter, even if by only the smallest degree.

CONCLUSION

We conclude the State's argument that Angelo failed to meet his burden to show the existence of biological material on Brown's clothing does not provide an alternate basis to affirm the district court's ruling. Angelo's petition alleged the presence of biological material satisfying the threshold requirements for testing under K.S.A. 2021 Supp. 21-2512(a). The State's response did not reveal a factual dispute as to this issue, likely because the State did not have the benefit of our statutory interpretation at the time. Thus, Angelo never had the opportunity to make this showing because no evidentiary hearing was conducted.

Yet the State's argument suggests it disputes Angelo's allegations concerning the presence of biological material on the victim's clothing. If the State had the benefit of the three-step process identified in this opinion, then its response could have disclosed this factual dispute and demonstrated the need for an evidentiary hearing. Thus, we remand this case for further proceedings consistent with our statutory interpretation.

As we noted, such a remand would be futile if the district court nevertheless properly concluded that DNA testing of the presumed biological material on Brown's

clothing could not produce exculpatory evidence. But assuming such biological material exists, DNA testing may produce exculpatory evidence if the results show the absence of Angelo's DNA on Brown's clothing coupled with the presence of Little Pat's or Little Reese's DNA. Such results may ultimately carry little evidentiary weight, but the Legislature has set a low bar for ordering DNA testing under K.S.A. 2021 Supp. 21-2512(c), and concomitantly, a high bar for summary dismissal at this stage. Based on the facts and evidence unique to this case, Angelo's petition surpasses the low bar.

We thus affirm the district court's judgment denying DNA testing of biological material on: (1) the clothes Angelo wore on the day of the murders; (2) the alleged murder weapon; and (3) residue from Angelo's hands. We reverse the district court's ruling that even if biological material exists on the victim's clothing, testing would not produce exculpatory evidence. But this holding alone is not sufficient for Angelo to prevail in his quest for DNA testing because the district court made no fact finding about the actual existence of biological material on the victim's clothing. As such, we remand the matter for this factual inquiry and further proceedings consistent with this opinion and the three-part procedure governing the pretesting phase of proceedings under K.S.A. 2021 Supp. 21-2512.

Judgment of the district court is affirmed in part and reversed in part, and the case is remanded.

BILES, J., concurs in the result.